**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**LISA A. KIRBY,**

   **Plaintiff,**

         **Civil Action 2:20-cv-3441**
 **v.**        **Judge Sarah D. Morrison**
         **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

   **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Lisa A. Kirby, brings this action under 42 U.S.C. § 405(g) for review of a final

decision of the Commissioner of Social Security ("Commissioner") denying her applications for

social security disability insurance benefits and supplemental security income.  This matter is

before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's

Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No.

17), and the administrative record (ECF No. 10).  Plaintiff did not file a Reply.  For the reasons

that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors

and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

Plaintiff filed her applications for disability insurance benefits and for supplemental

security income in July 2015, alleging that she has been disabled since January 22, 2015, due to

chronic obstructive pulmonary disease ("COPD"), stenosis, scoliosis, muscular disorder of her back neck and shoulders, spondylosis, deep vein thrombosis ("DVT"), anxiety, depression, and peripheral vascular disease. (R. at 1154-60, 1197.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 1058-60.) Administrative Law Judge ("ALJ") Jessica Inouye held a video hearing on February 15, 2018, at which Plaintiff, who chose to appear without the assistance of counsel, testified. (R. at 115-65.) On August 15, 2018, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 1015–38.) On September 25, 2018, Plaintiff filed a Request for Review of Hearing Decision Order. (R. at 1093-1101.) On April 5, 2019, the Appeals Council vacated ALJ Inouye's hearing decision and remanded this case to an ALJ for resolution of further issues, including reconsideration of Plaintiff's maximum residual capacity function, evaluation of Plaintiff's treating source, and identification and resolution of any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles ("DOT"). (R. at 1039-42.)

ALJ Thomas L. Wang held a supplemental hearing on September 25, 2019, at which Plaintiff, again not represented by counsel, appeared and testified. (R. at 78-114.) On November 13, 2019, ALJ Wang also found that Plaintiff was not disabled. (R. at 23-68.) On May 8, 2020, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-7.) This matter is properly before this Court for review.

## II.   HEARING TESTIMONY

Plaintiff testified at the administrative hearing on September 25, 2019, that in January 2015, she had what she described as a "nervous breakdown type" along with physical issues, home issues, and domestic issues; then she lost her job. (R. at 89.) She said "technically, I kind of got fired, but I kind of quit through the temp agency." (*Id.*) She continued that due to her depression, "I didn't get up and go to work like I should have, and, by all rights, they should have fired me." (*Id.*)

When asked what prevented her from working, she responded "As a whole, it's all of my health issues that I have….. depression, anxiety, PTSD, COPD stage II, fibromyalgia, DVTs, which is blood clots. I have deep venous reflux and reflux insufficiency in my legs. I have degenerative disease in my spine, osteoarthritis, dysrhythmia." (R. at 90.) Plaintiff testified that she can't sit or stand for long periods of time, her legs hurt and go numb, her left side hurts and she gets headaches. She also has issues with her blood pressure dropping. (*Id.*)

When discussing her mental health issues, Plaintiff testified that she is "dealing with mood swings," anxiety issues and concentration. (R. at 91.) Plaintiff noted she was on 15 different medications daily, for both physical and mental issues and it made her feel "fogged." (R. at 92.)

Plaintiff testified that she wasn't able to sit or stand for longer than 30 minutes at a time. She suffers from pain in her legs and back. "My legs go numb on me, and I have charley horses and spasms in them." (*Id.*) She also testified that she can't lift anything heavy. She noted she doesn't have "the strength that I used to have." (*Id.*)

A lengthy discussion was held regarding Plaintiff meeting with Dr. Kelso to complete the opinion form that he completed on Plaintiff's behalf. (R. at 93-101.) Plaintiff noted that she recently met with Dr. Kelso again to "re-do all my food stamps and my medical, and that -- he wanted to go back over that form because he wasn't going to give me a letter unless I could explain to him why. He is a pretty straightforward doctor. He doesn't want to - if he doesn't feel like you're not able to work, he's not going to back you." (R. at 97-98.)

When discussing Dr. Sharma's assessment, Plaintiff indicated that she had seen him at Mid-Ohio Behavioral Health for psychiatric care. She testified that she dropped the form off. She believes the nurse practitioner went over the form with Dr. Sharma from what she listed on other documents regarding her own perceived limitations. (R. at 102-04.)

### III.      MEDICAL RECORDS AND OPINION

### A.      Gregory L. Kelso, M.D.

Plaintiff received primary care at Muskingum Valley Health Center beginning in 2012. She was treated for neck pain, emphysema, fatigue, back pain, and depression. (R. at 889-939, 1377-1496, 1574-96, 1628-58, 1819-1909.) Specifically, in July 2014, when being treated by the nurse practitioner, Plaintiff complained of neck pain and stiffness in the left side of her neck and sharp, shooting back pain. (R. at 1384.) She exhibited tenderness and pain in her lumbar back area upon examination. (R. at 1385.) In July 2015, Plaintiff presented with an evaluation of dyspnea and a cough. She was assessed with moderate COPD with signs of exacerbation and anxiety. She was placed on prednisone, and her anxiety was noted as a contributing factor to her sensation of dyspnea. (R. at 1409-10.) When seen by the nurse practitioner in February 2016,

Plaintiff continued to complain of facial numbness and upper and lower left extremity tingling and weakness. She also reported bilateral fingertip/hand numbness and tingling. PHQ-9 testing resulted in a total score 24. She was not seeing anyone for mental health. Plaintiff felt numbness and tingling are leading to increased stress and anxiety, causing her to become more depressed. (R at 1856.) On examination, she exhibited weakness in both the upper and lower left side extremities. Her thought content was normal, and her mood appeared anxious. (R. at 1858.)

On February 15, 2017, Dr. Kelso, one of the physicians at the Muskingum Valley Health Center completed a functional capacity assessment in which he listed Plaintiff's medical conditions as neck pain, back pain, left facial numbness, pelvic surgery, and left leg SVT. Dr. Kelso reported that Plaintiff suffers from neck and back pain to palpation with reduced range of motion. (R. at 2083.) Dr. Kelso opined that Plaintiff was limited to 1 hour of standing in an 8-hour workday for 30 minutes at a time, and 4 hours of sitting in an 8-hour workday also for 30 minutes at a time. Dr. Kelso also opined that Plaintiff was capable of lifting up to 5 pounds frequently and was moderately limited in her ability to push, pull, and use her feet for repetitive foot movements. Dr. Kelso further opined that Plaintiff was markedly limited in her ability to bend, reach, and handle. Dr. Kelso noted that he did not perform any physical testing because "I don't do that," and the limitations he assessed were based upon information provided by Plaintiff. (R. at 2084.)

### B. Genesis Healthcare/Good Samaritan Hospital

Plaintiff was admitted to the hospital following an overdose in February 2014. (R. at 1437- 67.) Plaintiff ingested roughly a dozen Klonopin. (R. at 1438.) She was diagnosed with

an adjustment disorder with mixed emotional features and accorded a global assessment of functioning (GAF) score of 45. (R. at 1439.)

In May 2015, Plaintiff was seen in the emergency department complaining of cervical neck pain following a visit to a chiropractor. Plaintiff reported that her neck pain was tingling, constant, and radiating to her left upper extremity. Her pain started the previous week and worsened last night when she "turned her neck and felt a pop." Plaintiff reported that movement worsens pain, and nothing relieves pain. She had used a heating pad on her neck at home, along with the medications, Flexeril and Neurontin with no relief. Plaintiff rated her pain severity at a level of 8 on a 0-10 visual analog scale. She also reported headaches, blurry vision, and dizziness. (R. at 1547.) On examination, she exhibited tenderness in palpation in the midline neck region and left paraspinal muscle tenderness to palpation. (R. at 1548.) Plaintiff received morphine to improve her pain and prescribed a Medrol Dosepak. (R. at 1550.)

Plaintiff was again admitted to the hospital in April 2016, for depression after ingesting 15 gabapentin, 6 tizadine, 6 diclofenac and 4 BuSpar. The EMS squad reported she was alert but sleepy en route. Once in the emergency department, Plaintiff appeared drowsy but she answered all questions appropriately. Plaintiff states she was "fed up," "fighting with my kids," "my boyfriend and I fought," "I hurt every day and I am tired." She stated that this was an attempt to kill herself. (R. at 1977.) On initial evaluation, she was mildly sedated and tearful, but exhibited a normal mood and affect. Her speech was normal but slowed and she expressed suicidal ideation. (R. at 1975.) Plaintiff stated that she thinks her sister called the police for a wellness check and when the officer came, she admitted to him what she had done. Plaintiff was

diagnosed with major depression and was eventually discharged after three days once she was stable. (R. at 1943-80.)

### C. Mukesh Rangwani, M.D.

Plaintiff saw Dr. Rangwani in April 2016, while she was hospitalized. When he examined Plaintiff, she was no longer suicidal and ready to go home. Dr. Rangwani noted Plaintiff could be discharged after a family conference. Plaintiff was to be followed as an outpatient with Mid-Ohio Behavioral Health. (R. at 1943.)

In May 2016, Plaintiff was evaluated at Mid-Ohio Behavioral Health by a social worker for her initial assessment. (R. at 2002-08.) When discussing her mental health problems, she reported issues with poor appetite, sadness, diminished interest, low energy, feelings of worthlessness, restless, fatigue, distress, and poor focus. (R. at 2005.) Plaintiff was diagnosed with other specified bipolar and related disorders and PTSD. (R. at 2007.) On mental status examination, Plaintiff exhibited rapid speech, a flight of ideas, and a depressed mood. (R. at 2008.)

Plaintiff treated with Dr. Rangwani for her first visit after hospitalization on May 24, 2016. (R. at 2009-11.) At that time, Plaintiff reported she was still feeling depressed, down and not motivated. On mental status examination, she was cooperative, her speech was normal, her mood was "good," affect was neutral. She denied any suicidal or homicidal thoughts, she was goal directed and attention and concentration were intact. Her insight and judgment were noted to be fair. He diagnosed major depression, recurrent. Plaintiff's medications were reviewed and updated. (R at 2010.)

### D.     Ajay Sharma, MD

In February 2017, Dr. Sharma, also a psychiatrist with Mid-Ohio Behavioral Health completed a mental functional capacity assessment. Dr. Sharma opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out very short and simple instructions; and markedly limited in her ability to remember work-like procedures, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with or proximity to others, make simple work-related decisions, complete a normal workday or week, interact appropriately with the general public, accept instructions, get along with coworkers, and maintain socially appropriately behavior. (R. at 2089-90.)

### E.     Steven J. Meyer, Ph.D.

Dr. Meyer examined Plaintiff on September 23, 2015, for disability purposes. (R. at 1597-1602.) Plaintiff was driven by her boyfriend and arrived a half-hour early. When asked about the nature of her disability, besides physical impairments, Plaintiff reported that she has anxiety. (R. at 1597.) On mental status examination, Plaintiff's affect was blunted and her prevailing mood was dysphoric, irritable, and anxious. Physically, Plaintiff reported that she was feeling achy and tired. (*Id*.) Plaintiff performed serial seven addition to 49 with no errors. (R. at 1599.) Plaintiff accurately identified the current President of the United States and his immediate predecessor, and stated what to do if she found an addressed, sealed and stamped with a new stamp envelope, and a reason why clothes are washed, at that time. (R. at 1600.) Dr. Meyer assessed Plaintiff with an adjustment disorder with anxiety and depression. (*Id.*)

Dr. Meyer opined that Plaintiff has the cognitive capacity to understand, remember, and carry out simple and moderately complex routine instructions and tasks. Dr. Meyer also opined that Plaintiff had good concentration, persistence, and pace; could perform adequately in a setting without strict production requirements and with some assistance as needed when performing new tasks; could perform in a nonpublic position with regular interactions with coworkers and supervisors; and could tolerate a low stress work setting. (R. at 1601.)

### F. Floyd Sours, M.A.

Mr. Sours examined Plaintiff on April 27, 2016, for disability purposes. (R. at 1981-86.) Plaintiff was driven to the examination and reported that she lives with her daughter, daughter's son and daughter's boyfriend. She was arrested in 2014 for disorderly conduct in a medical facility, and has a history of arrests for petty theft and passing a bad check. Plaintiff reported she suffered from depression, anxiety and panic attacks. (R. at 1981.) She has some college, earning a diploma from heating and cooling. Plaintiff reported that she left her last job due to a "melt down," had been fired for not showing up. Mr. Sours found Plaintiff had clear, easily understood speech with normal tempo and volume. She appeared to be a responsible informant. (R. at 1982.) She exhibited a minimal range of emotion. She described withdrawal, poor concentration, loss of interest, and fatigue. Plaintiff reported a lot of anxiety in the last two weeks, racing thoughts, and no hallucinations. (R. at 1983.) He assessed an unspecified bipolar and related disorder and unspecified anxiety disorder. Mr. Sours opined that Plaintiff would have the ability to understand, remember, and carry out instructions in a work setting, with mild limitations on her ability to maintain appropriate behavior in a work setting as she related to co-

workers and supervisors.  She could attend and concentrate as she persists and paces herself in the pursuit of repetitive and multistep tasks.  (R. at 1984-85.)

G.    **State Agency Review**

State agency psychologist, Juliette Savitscus, Ph.D. reviewed Plaintiff's file on October 23, 2015 and found that Plaintiff had no restrictions of daily activities, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace.  (R. at 946.)  Dr. Savitscus found that Plaintiff's statements are credible, noting that Plaintiff reported she is capable of chores, cooking.  She has hobbies.  She interacts with friends and family.  The medical evidence notes some somatic complaints which may interfere with Plaintiff's social functioning, adaptation and concentration, persistence and pace. Plaintiff's limitations could reasonably be produced by her impairments although conditions are not found to be disabling.  (R. at 947.)  Dr. Savitscus concluded that Plaintiff should not have high pace or production requirements.  According to Dr. Savitscus, Plaintiff can adapt to routine, infrequent changes that are easily explained.  (R. at 949-50.)

State agency psychologist, Deryck Richardson, Ph.D., reviewed the file at the reconsideration level on May 19, 2016 and affirmed Dr. Savitscus' assessment.  (R. at 981-83, 986-88.)

State agency physician, Stephen Sutherland, M.D., reviewed Plaintiff's file in November 2015 and determined that Plaintiff could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds; stand and/or walk for a total of 6 hours; sit for a total of 6 hours in an

8-hour workday.  (R. at 948.)  Dr. Sutherland, also opined that Plaintiff must avoid concentrated exposure to extreme fumes, odors, etc.  (*Id.*)

Upon reconsideration, state agency physician, David Knierim, M.D., reviewed Plaintiff's file in January 2017 and affirmed Dr. Sutherland's assessment except he found Plaintiff could only occasionally climb ladders/ropes scaffolds and only frequently crawl.  (R. at 984-86.)

## IV.    ADMINISTRATIVE DECISION

On November 13, 2019, the ALJ issued his decision.  (R. at 23-68.)  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016.  (R. at 27.)  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since January 22, 2015, the alleged onset date. (*Id.*)  The ALJ found that Plaintiff had the severe impairments of degenerative changes of the

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

cervical, lumbar, and thoracic spine, asthma, chronic obstructive pulmonary disease ("COPD"),

emphysema, pulmonary nodules, chronic venous insufficiency, and depressive, anxiety, and

trauma- and stress-related disorders.  (*Id.*)  He further found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listed

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 30.)  At step four of

the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as

follows:

> After careful consideration of the entire record, [the ALJ] find[s] that the claimant
> has the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b). Balancing, crouching, handling with the left upper
> extremity, and stooping, are each limited to no more than frequently. Climbing
> ramps and stairs, crawling, kneeling, operation of foot controls with the left lower
> extremity, and pulling and pushing with the left lower and upper extremities, are
> each limited to no more than occasionally. She cannot climb ladders, ropes, and
> scaffolds, and must avoid concentrated exposure to extreme cold and heat, and
> irritants such as dust, fumes, gasses, odors, and poor ventilation. Mentally, the
> claimant retains the capacity to perform goal-based production or work measured
> by end result, with no pace work. She is limited to work in a low stress job, defined
> in this case as work with no more than occasional changes in work setting. She
> cannot interact with members of the general public, and perform work with high
> pace or production requirements. She requires assistance in the way of work
> demonstration when asked to perform new tasks. She is limited to performing
> simple and moderately complex routine tasks.

(R. at 39.)

In making the above determination, the ALJ gave the opinion of Dr. Kelso no weight

finding it was inconsistent with and unsupported by the totality of the evidence.  (R. at 46-47.)

The ALJ afforded little weight to the majority of Dr. Sharma's opinion because it was

inconsistent with and unsupported by the totality of the evidence.  (R. at 54-57.)  The ALJ

assigned significant weight to Dr. Meyer's consultative psychologist's opinion finding it was

consistent with and supported by the totality of the evidence; and partial weight to Mr. Sours' consultative opinion.  (R. at 51-54.)  The ALJ gave significant weight to the opinions of the state agency physicians, Drs. Sutherland and Knierim finding their opinions consistent with and supported by the record evidence and adding limitations based on Plaintiff's testimony.  (R. at 43-46).  The ALJ assigned partial weight to the assessments provided by Dr. Savitscus and Dr. Richardson in regards to Plaintiff's mental condition.  (R. at 48-51.)

Relying on the VE's testimony, the ALJ found that Plaintiff's limitations precluded her ability to perform her past relevant work as a general laborer.  (R. at 65-66.)  The ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy. (R. at 66-67.)   He therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since January 22, 2015, the alleged onset date.  (R. at 68.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.    ANALYSIS

In her Statement of Errors, Plaintiff contends that the ALJ erred in his evaluation of the

opinions provided by treating physician, Dr.  Kelso and treating psychiatrist, Dr. Sharma. (EFC

No. 13).  The Undersigned addresses Plaintiff's contentions of error below.

### A.  Treating Physician Rule

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as

"statements from physicians and psychologists or other acceptable medical sources that reflect

judgments about the nature and severity of your impairment(s), including your symptoms,

diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 408.[2]  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

---

[2] "Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017."  *Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *5 n.2. (N.D. Ohio Feb. 21, 2019) (citing 82 Fed. Reg. 5844-5884 (Jan. 18, 2017)).  Plaintiff's claim was filed before March 27, 2017, before the new regulations took effect.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1. Dr. Sharma

Turning first to Dr. Sharma, Plaintiff asserts that the ALJ did not articulate good reasons for according less than controlling weight to Dr. Sharma's treating-source opinions. As an initial matter, the record is wholly devoid of any information regarding the length or depth of Dr. Sharma's treating relationship with Plaintiff. Plaintiff testified without detail that Dr. Sharma was "the doctor [she] was seeing at Mid Ohio Behavioral Health." (R. at 102.) Plaintiff, however, did not begin treatment at Mid-Ohio Behavioral Health until after her hospitalization in 2016. (*See, e.g.*, R. at 1943.) Moreover, it appears she treated with Dr. Rangwani at Mid-Ohio Behavioral Health at least through May of 2016. (R. at 2010.) Indeed, the only record related to Dr. Sharma is the completed mental-functional capacity assessment form (R. at 2089-90), which Plaintiff confirmed in her testimony she had provided together with a list of her own perceived limitations. (R. at 102-03.) Plaintiff submits that "Dr. Sharma did not indicate the date the form was completed, but Dr. Sharma did indicate that treatment with Ms. Kirby began in February of 2012, and the last examination of Ms. Kirby was on February 1, 2017." (Pl's Brief (ECF No. 13) at 13.) A closer inspection of the document reveals, however, that Dr. Sharma did *not* indicate that he had been treating with Plaintiff since February of 2012, as there is no box that requests

that information.  (R. at 2089.)  Moreover, there is a signature date on the form, which appears to the Court to be February 24, 2017, with the "7" in 2017 being a French-crossed numeral.

Even assuming Dr. Sharma was a treating medical source, the ALJ did not err in affording his opinion little weight because it was inconsistent with and unsupported by the totality of the evidence.  This decision is supported by substantial evidence.

The ALJ discussed and referred a tremendous number of records.  The Undersigned agrees that the evidence of record does not support the marked mental limitations opined by Dr. Sharma.  Dr. Sharma opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out very short and simple instructions, but markedly limited in her ability to remember work-like procedures, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with or proximity to others, make simple work-related decisions, complete a normal workday or week, interact appropriately with the general public, accept instructions, get along with coworkers, and maintain socially appropriately behavior.  (R. at 2089.)

Yet, Plaintiff often times had normal mental status examinations.  (R. at 1386, 1551, 1750, 1759, and 1821.)  Notably, Plaintiff reported she could not work primarily or solely due to physical impairments.  (R. at 1598, 2003.)  Plaintiff repeatedly presented as calm, cooperative, pleasant, and talkative, with appropriate, average, full, good, neutral, and normal affect, behavior, demeanor, and mood.  (R. at 1387, 1521, 1549, 1577, 1599, 1635, 1649, 1751, 1760, 1805, 1810, 1943, 1951, 1974-75, 1982, 2001, 2008, 2010, 2023, 2163, 2167, 2171, 2178, 2190, 2371, 2380, 2478, 2486, 2500-01, 2590.)  She also sometimes had personal health questionnaire

scores reflecting no more than mild depression.  (R. 2029, 2033.)  Plaintiff had average, intact, and normal cognition, comprehension, and fund of knowledge, and no cognitive impairment.  (R. at 1387, 1549, 2008, 2010, 2023, 2494.)  She repeatedly presented as alert, attentive, awake, and oriented, with average, goal directed, good, intact, logical, and normal attention, concentration, eye contact, memory, and thought content and processes, and no loosening of associations.  (R. at 1386-87, 1409, 1520-21, 1531-32, 1548-49, 1577, 1599, 1604, 1634-35, 1643, 1649, 1750-52, 1760, 1805, 1810, 1848-49, 1857-58, 1943, 1951, 1954, 1975, 1983, 2001, 2008, 2010, 2022-23, 2029-30, 2034, 2163, 2166-67, 2171, 2178, 2189-90, 2199, 2318, 2331, 2368, 2380, 2451, 2463, 2468, 2472, 2478, 2486, 2494, 2500, 2521, 2524, 2558, 2590-91.)  In April 2016, the consultative psychologist found that Plaintiff had good concentration, pace, and persistence and had no problems understanding simple and moderately complex instructions at the September 2015 psychological consultative examination.  (R. at 1599-1600.)  Plaintiff reported babysitting a grandchild.  (R. at 1210, 2585), cleaning a friend's residence to obtain income, and managing her medications without reminders.  (R. at 1211.)  Given all of this, the Undersigned concludes that the ALJ's decision to afford Dr. Sharma's opinion only little weight regarding Plaintiff's marked limitations enjoys substantial support in the record.

### 2. **Dr. Kelso**

Plaintiff contends that the ALJ's decision should be reversed because the ALJ erroneously discredited the opinion of Dr. Kelso and did not articulate good reasons for according less than controlling weight to his treating-source opinions.  Again, in February 2017, Dr. Kelso opined that Plaintiff could lift and carry up to 5 pounds; could stand up to 1 hour in a

workday for 30 minutes at a time; could sit up to 4 hours in a workday for 30 minutes at a time; and was markedly limited in her ability to bend, reach, and handle. (R. at 2083-84.) The ALJ gave the opinion of Dr. Kelso no weight because it was inconsistent with and unsupported by the totality of the evidence. (R. at 46-47.) This decision is supported by substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2)-(4).

For instance, Plaintiff was ambulatory on her heels, toes, and in tandem; had a normal and steady gait, station, stride length, arm swing, and base width; had no gait disturbance and problems; and ambulatory aid usage. (R. at 1215, 1547, 1551; 1817, 1858, 1982, 2010, 2199, 2383, 2494.) She repeatedly had negative musculoskeletal and neurological examination results, with full, good, intact, and/or normal coordination, cranial nerves, range of motion, reflexes, sensory, strength, and tone. (R. at 1386-87, 1520-21, 1531, 1549, 1551, 1577, 1635, 1649, 1750-51, 1759-60, 1805, 1817-18, 1821, 1848, 1858, 1954, 1974-75, 2009, 2022, 2199, 2318, 2331, 2494, 2501.) Plaintiff had normal cervical, thoracic, and lumbar spine imaging results. (R. at 391, 1520, 1569, 1818.) Further, Plaintiff reported performing activities that undermine a finding of significant limitations such as occasional exercising (R. at 2589), moving furniture (R. at 47, 1520) and walking 20-30 minutes at a time. (R. at 1214.) *See, e.g., Hummel v. Comm'r of Soc. Sec.*, No. 2:16-cv-937, 2018 WL 1373869, at *3 (S.D. Ohio Mar. 19, 2018) (finding inconsistency with record evidence, including activities of daily living constitutes good reason to discredit treating physician's opinion).

The Court finds it significant that Dr. Kelso did not provide specific evidence to support his restrictive opinion, which the ALJ also recognized. Dr. Kelso admitted his opinion was

based on Plaintiff's subjective reports rather than objective findings and even wrote "Patient provided info. No physical testing done. I don't' do that." (R. at 2084.) The Undersigned concludes that the ALJ properly discounted Dr. Kelso's opinion and the decision to do so is supported by substantial evidence. *See, e.g., Holmes v. Astrue*, No. 3:08CV2108, 2010 WL 1258080 (N.D. Ohio 2010) (holding ALJ properly discounted opinion that was conclusory and appeared to have relied heavily on claimant's subjective reports of symptoms, and seemed to uncritically accept as true most, if not all, of what claimant reported).

## VII.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report an\d Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 7, 2021

/s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
United States Magistrate Judge